## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RYAN UMBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-1045-JES-JEH |
| | ) | |
| CITY OF PEORIA, ILLINOIS *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendants' Motion (Doc. 50) for Summary

Judgment. Plaintiff has filed a Response (Doc. 53) and Defendants have filed a Reply (Doc. 56).

For the reasons set forth below, Defendants' Motion is granted.

### BACKGROUND

### A.  Procedural Background

After being terminated or forced to resign from the Peoria Police Department ("the

Department") as a probationary employee, Plaintiff Ryan Umberger filed a ten-count Complaint

against Defendants City of Peoria, Illinois, former Chief Jerry Mitchell, Captain Michael Scally,

Captain Loren Marion, former Lieutenant Steven Roegge, former Field Training Sergeant

Bradford Venson, and unknown Defendants. Doc. 1, at 1. Plaintiff generally alleges Defendants

discriminated against him because of his disability, attention deficit hyperactivity disorder

("ADHD"), which caused various constitutional deprivations.

On June 27, 2019, Defendants filed a motion to dismiss for failure to state a claim. *See*

Docs. 16; 17. Plaintiff filed a response to Defendants' motion on October 23, 2019 and

Defendants filed a Reply on December 13, 2019. Docs. 23; 27. On April 21, 2020, the Court

granted in part and denied in part Defendants' motion to dismiss. Doc. 28, at 22. The Court

1

dismissed the following Counts: the Section 1983 conspiracy claim against all individual

Defendants (Count III); the Title VII claim (Count IV) against all Defendants; the *Monell* claim

(Count V) against Peoria; the Uniformed Services Employment and Reemployment Rights Act

(Count VIII) against all Defendants; and the Sections 1985 and 1986 conspiracy claim (Count X)

against all Defendants. The Court also dismissed Counts I and II only as to Defendants Peoria,

Mitchell, and Roegge and dismissed Count VII only as to Defendants Peoria, Mitchell and

Roegge. Doc. 28.[1] Plaintiff was given an opportunity to file an amended complaint for various

Counts but chose not to do so. Thus, five Counts remain: the Section 1983 disability based

discrimination claim (Count I) against Defendants Venson, Scally, and Marion; the procedural

due process claims (Counts II and VII) against Defendants Venson, Scally, and Marion; the state

law indemnification claim (Count VI) against Peoria and the Violation of Americans With

Disabilities Act, 42 U.S.C. § 1201 and Section 504 of Rehabilitation Act of 1973, 29 U.S.C. §

701 claim (Count IX) against the City of Peoria.

### B. Summary Judgment Briefing

Despite the assertion in the first sentence of his Response that Plaintiff, by and through

his attorneys, complied with Federal Rule of Civil Procedure 56 and Local Rule 7.1, Plaintiff's

brief is rife with blatant disregard for this District's Local Rules and well-known standards

applied in summary judgment briefing. As the Court has informed parties in previous cases,

> While strict, the requirements imposed on the parties by Rule 56 and Local Rule
> 7.1(D) are not meant to be punitive. "Rather, they are intended to alert the court to
> precisely what factual questions are in dispute and point the court to the specific
> evidence in the record that supports a party's position on each of these questions.
> They are, in short, roadmaps, and without them the court should not have to proceed
> further, regardless of how readily it might be able to distill the relevant information
> from the record on its own." *Waldridge*, 24 F.3d at 923 . . . Because summary

---

[1] As stated in the Court's previous Order (Doc. 28), the Complaint misnumbers the claims in Counts V– IX. To prevent confusion, the Court follows the numeric sequence of the preceding Counts and refers to them as Counts VI–X.

2

> judgment is such a drastic remedy, the Court regularly informs the parties when they fail to adhere to these strict requirements, and exercises its discretion to decide whether to apply the rule strictly or to overlook any transgression. *Id*.

*McMahon v. Dunlap Cmty. Unit Sch. Dist. No. 323*, 274 F. Supp. 3d 836, 842–43 (C.D. Ill. 2017); *see also Lugg v. Sutton et al.*, No. 18-CV-1412-JES-JEH, 2021 WL 3673824, at *2 (C.D. Ill. Aug. 18, 2021). As relevant to Plaintiff's failures here, Local Rule 7.1(D)(2)(b) provides that a response to a summary judgment motion must state, in separate subsections: undisputed material facts, disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional material facts. With regard to the undisputed material facts section, the plaintiff is instructed to "[l]ist *by number* each fact from Section B of the motion for summary judgment which is conceded to be undisputed and material." CDIL-LR (D)(2)(b)(1) (emphasis added). Local Rule 7.1(D)(2)(b)(6) cautions, "[a] failure to respond to any numbered fact will be deemed an admission of the fact." *Id*. Likewise, Fed. R. Civ. P. 56(e)(2) provides that when a party fails to properly address another party's assertion of fact as required by Rule 56(c), the court may, *inter alia*, "consider the fact undisputed for the purposes of the motion."

Here, Plaintiff's Response to Defendants' Motion for Summary Judgment failed to respond to any of Defendants' statements of material fact to note, by number, whether such facts were undisputed or disputed and material or immaterial. Instead, Plaintiff chose to re-write his own "undisputed material facts" as he saw fit and to intermittently cite to pages in Defendants' brief for support. A summary judgment brief is not evidence, it is the Parties' argument which cites to evidence in support. *Cf.* Fed. R. Civ. P. 56(c)(1)(A) (identifying examples of materials in the record to include depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, and interrogatory answers); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials *in*

*the record*") (emphasis added). Plaintiff did not even cite to the particular paragraph of Defendants' statement of material facts to which he was referring. To the extent it is difficult to ascertain what evidence Plaintiff is trying to refer to, the Court disregards those facts because they do not point to affidavits, depositions, or other evidence of an admissible sort. *See* Fed. R. Civ. P. 56(e)(2); CDIL-LR 7.1(D)(2)(b)(5) ("Each additional fact [in a summary judgment response] must be supported by *evidentiary* documentation referenced by specific page.").

### 1. Defendants' Statement of Undisputed Material Facts

As indicated above, Plaintiff failed to properly respond to Defendants' statement of undisputed material facts, therefore, unless otherwise noted, the following facts are undisputed. *See* CDIL-LR 7.1(D)(2)(b)(6); Fed. R. Civ. P. 56(e)(2).

### *Peoria Police Department Recruits and the Nature of their Employment*

On February 27, 2017, Plaintiff was hired by the Department as a probationary police officer or "recruit." Doc. 50, SOF ¶ 1.[2] Prior to his employment, Plaintiff had received formal basic training at police academies through prior employers. SOF ¶ 15. Upon hiring, Plaintiff attended an initial orientation where he received training on unlawful harassment and signed an acknowledgment outlining his responsibility to submit a complaint if he felt that he was "personally being harassed." SOF ¶¶ 12-13. He also received an Employee Handbook, which included an ADA policy and discussed reasonable accommodations and where to go if the employee has questions. SOF ¶¶ 10-11.

Each newly appointed police officer is regarded as a probationary employee during the first year of his or her employment plus one day for each of formalized training excluding the

---

[2] Unless otherwise indicated, the Court takes the undisputed facts from Defendants' Motion at Doc. 50, which are cited as SOF ¶ ___. Where the Court minimally cites to Plaintiff's SOFs in Doc. 53 throughout this Opinion, they are cited as Pltfs. SOF ¶ ___.

Field Training Program ("FTP"). SOF ¶ 14. Plaintiff's probationary period began on February 27, 2017, with an expected expiration date of February 27, 2018. SOF ¶ 16. During probation, recruits are "at-will" employees. SOF ¶ 18. The Chief of Police does not need cause to separate a probationary officer from employment. *Id.* (citing Ex. E, Mitchell Dep., pp. 90-91; Ex. Q, Collective Bargaining Agreement, § 18.7 – "The retention of the probationary officer is at the discretion of the City and his dismissal shall not be subject to the grievance procedure."; Ex. R, Sec. 2-176 and 2-178 of the Peoria City Code). General Order 300.11, which is used internally at the Department, does not state that a recruit or probationary officer could only be fired "for cause." SOF ¶ 22.

### Field Training Program and Expectations

During his probationary year, Plaintiff was required to successfully complete the Department's FTP, otherwise he could be let go. SOF ¶ 17. Understanding Department policies and how certain people want the officer to perform are essential functions of the job of a PPD police officer. SOF ¶¶ 63, 66. The FTP teaches recruits the essential functions of the job of a patrol officer. SOF ¶ 23. It is outlined in General Order 300.11 and includes a 14-day orientation, untimed written tests, recruit school, and five phases of field training under the supervision of FTOs–phases I, II, III, IV ("shadow phase") and V ("solo"). SOF ¶ 24. The FTP can be completed in as little as 16 weeks, which would entail four weeks for each of the three phases, two weeks of shadows at minimum, a week in a traffic unit, and a week encompassing two days in the crime lab, two days in the technology bureau, and a day with the communications center. SOF ¶ 32. During each phase, each recruit is assigned a different Field Training Officer ("FTO") who is responsible for training, evaluation, and supervision of the recruit. SOF ¶¶ 33-34. FTOs use daily, weekly, mid-phase, and end-of-phase forms and reports as guidelines to detail their observations and evaluations. SOF ¶ 40. To become an FTO, the officer must complete a training

program, which includes learning the standards for recruits, how to teach those standards, and how to evaluate recruits, including training on how to apply the performance area ratings. SOF ¶ 35. During Plaintiff's time as a recruit, Defendant Sergeant Brad Venzon was the Field Training Sergeant responsible for the FTP. SOF ¶ 6. Defendant Michael Scally was a Captain, Defendant Loren Marion was the Investigations Captain, then Assistant Chief, and Jerry Mitchell was the Chief of Police for the City of Peoria. SOF ¶¶ 2-3, 7.

During the first three phases of the FTP, the recruit is responsible for completing different percentages of the workload prior to advancing to the next training phase: at least 25% of the workload in Phase I; at least 55% of the workload in Phase II, and at least 95% of the workload in Phase III. SOF ¶¶ 26-28. In Phase I, the recruit rides along with the FTO who teaches the recruit how to take calls and perform as a patrol officer. SOF ¶ 26. Phase III is a field training and evaluation period with an emphasis on reviewing the essential skills and knowledge required of a competent police officer, as well as corresponding classroom instruction. SOF ¶ 28. Phase IV is known as "shadow phase" wherein the FTO is in plain clothes and the recruit is in uniform, then the FTO shadows the recruit in the same patrol unit. SOF ¶ 29. In this role, the FTO serves solely as an evaluator of the recruit's performance. *Id*. The recruit is responsible for 100% of the police functions and should not be making any serious fundamental mistakes. SOF ¶¶ 29-20. The recruit is expected to have a satisfactory rating in all 11 performance areas. SOF ¶ 38. Upon successful completion of shadow, the recruit is certified for Phase V, the solo patrol assignment, which spans the balance of the probationary employment period. SOF ¶¶ 29, 31.

As set forth by General Order 300.11, recruits are evaluated in each phase on 11 objective performance areas: (1) electronic communication skills; (2) motor vehicle operation; (3) orientation skill/jurisdictional geography; (4) written communication; (5) field performance;

(6) criminal law/ordinances; (7) departmental policies/procedures; (8) self-initiated field activities; (9) traffic/law enforcement; (10) attitude toward police work/dependability/ relationships; and (11) attire/dress/equipment. SOF ¶ 25 (citing Ex. A, Umberger Dep., p. 206-207; Ex. D, Venzon Dep., p. 21, 23, 28; Ex. G, p. 8-11). Each phase also included written tests to test the recruit's knowledge in areas of radio, electronic communications, geography, criminal law, and traffic law. SOF ¶ 41. The purpose of the testing is to check the knowledge gained in police training or as recruits continue to study. SOF ¶ 42. Every recruit who has successfully completed the FTP and was hired had satisfactory performance standards in all 11 areas at the end of shadow phase. SOF ¶ 51. The FTOs may vary in how they grade recruits but know the acceptable standard so that they grade recruits based on what they observe on the job and compare it to the acceptable standard. SOF ¶ 39.

The FTOs reported directly to Venzon and, if there was a training issue, it was brought to his attention to address and resolve. SOF ¶ 48. Venzon's duties also included scheduling recruits with FTOs and reviewing observations reports submitted by FTOs of the recruits. SOF ¶ 47. If a recruit was struggling with training areas, meetings would be conducted to discuss the issues and, when necessary, remedial training and/or extensions of a particular phase would be afforded the recruit. SOF ¶ 49. If a recruit required remedial training, then a memorandum of the training meeting and remedial training plan was sent to the Field Training Lieutenant. *Id*. A remedial training plan references specific training for a specific issue or performance area and includes training techniques that had been used with recruits in the past and showed results. SOF ¶ 50.

### Plaintiff's ADHD

Plaintiff has ADHD and has had it since childhood. SOF ¶ 60. In Plaintiff's view, his ADHD substantially impacts his ability to focus, learn, and comprehend what he reads. SOF ¶

61. ADHD has substantially limited his ability to work as a police officer by impacting his ability to understand geography, department policies, logs, work performance, and how certain people want things done. SOF ¶ 62.

Plaintiff testified that he disclosed that he had ADHD to an unknown individual in Human Resources during his application process when he submitted urine for his drug screening. SOF ¶ 67. He testified that this was during a phone call and the purpose was to inform the caller that he took Adderall in case it showed up on his drug screen. *Id*. Plaintiff also testified he told Venzon that he had ADHD and took Adderall during Phase I of his field training (March/April 2017). SOF ¶ 68. He expressed that ADHD meant he was unable to focus on one or two things at a time, he did not learn the same as other individuals, that he took longer to understand and learn new concepts, and that he may need extra time for training. *Id*. Plaintiff never submitted anything in writing concerning his ADHD, his medication, or any request for accommodation. SOF ¶ 72. Plaintiff never asked for any accommodation for his ADHD before November 20, 2017, after his shadow phase was already extended. SOF ¶¶ 70, 121. During that meeting Plaintiff advised Venzon he had ADHD since age 12 and it meant he needed extra time for training and different ways to learn. SOF ¶ 71. Plaintiff also told an FTO that he had ADHD but does not recall who, when, or at what point in his training this conversation took place. SOF ¶ 73. Plaintiff did not tell anyone else at the City of Peoria or the PPD, including Marion and Scally, that he had ADHD. SOF ¶ 74. Scally did not know Plaintiff had ADHD or that he took medication. SOF ¶ 75. Mitchell did not know of Plaintiff requesting accommodations during training. SOF ¶ 76.

### *Plaintiff's Test Taking*

Geography is a critical skill, along with an understanding of Peoria's 100-block divider system, so that an officer is able to get where the officer is needed and arrive at a call. SOF ¶¶

55, 64. To meet the performance standard for orientation and geography, the recruit must: (1) demonstrate knowledge of major streets and intersections, locations, landmarks, block numbering, sequence, and patrol district and sector boundaries; (2) utilize street directories and maps without FTO prompting to determine locations and destinations; (3) remember location from previous visits and not need the district map to get there; (4) be aware of and utilize shortcuts; (5) arrive within a reasonable time; (6) be able to relay and articulate the officer's location; (7) not rely on FTO/electronic communications to find call location, and (8) not compromise public or officer safety by a lengthy call response. SOF ¶ 52. Much of the recruit's learning, such as being aware of and utilizing shortcuts, would be learned on the street with the FTOs. SOF ¶ 58. Although the police vehicles have a vehicle locator that could be used to map the route to a call, the Department did not want to recruits to rely on the technology because there was a delay in updating location and computers went down at times SOF ¶ 59. Although Venzon considers all performance areas important, he believes the most important area is field performance. SOF ¶ 65.

Each recruit including Plaintiff was tested on the 100-block dividers by a written exam which is essentially the study guide without the answers. SOF ¶ 57. Recruits, including Plaintiff, were provided a study guide to learn each 100-block of Peoria, including maps and a list of the hundred blocks. SOF ¶ 55. Plaintiff took the 100-block divider test a total of 22 times--18 times before eventually scoring 100%. SOF ¶ 77. Although the 22 tests covered the same material (geography and the 100-block dividers), the tests were not identical. SOF ¶ 78.

Additionally, on March 16, 2017, Plaintiff took a test on criminal law procedures with another recruit present. SOF ¶ 79. The FTO proctoring the test, Keith Burwell, accused Plaintiff of looking at another recruit's test. SOF ¶ 80. Burwell and Plaintiff spoke to Venzon about the

alleged cheating and were required to provide written statements about the incident. SOF ¶ 81. At the time, Plaintiff denied cheating on the test. SOF ¶ 82. According to Special Agent Matos, during a background investigation interview with the Illinois State Police in 2018, Plaintiff admitted that he cheated on the exam, lied to the FTO and the FTO supervisor, falsified his report about the incident, and continued to lie to the Department in order to keep his job. SOF ¶ 83 (citing Ex. J, Matos Dep., p. 42-43, 46, 50, 81). Plaintiff knew that honesty and truthfulness were essential functions of the job of police officer and that cheating and lying could have led to discipline and termination due to lack of integrity. SOF ¶¶ 84-85.

***Plaintiff's Training and Performance***

Like all recruits, Plaintiff was trained in the areas of emergency medical care, traffic operations, moving prisoners, making arrests, domestic violence, family disorders, juvenile investigations, criminal investigations, interviewing and interrogations, vehicle stops, patrols procedures, driving techniques, report writing, electronic communications, jurisdiction, geography, and preparing for patrol. SOF ¶¶ 43-44. He also received an FTP manual and guide, and a training checklist and orientation that described the field training he would receive. SOF ¶ 45. The performance area ratings given by FTOs are: (a) "S," meets performance standards; (b) "B/R," below performance standards but responding to training; (c) "B/F," below performance standards and failure to respond to training; and (d) "NR," no rating. SOF ¶ 36. A B/R rating is common for recruits in Phase I, but it is anticipated that progress would be shown in Phases II and III, with the acknowledgement that recruits are responsible for more work. SOF ¶ 37. Plaintiff was given an opportunity to review each daily, weekly, mid-phase, and end of phase evaluation, ask questions, and sign off on the FTO's evaluation of him. SOF ¶ 46.

10

Plaintiff's Phase IA field training spanned from March 18, 2017 to May 6, 2017, with FTO Grayson. SOF ¶ 86. At his mid-Phase I evaluation, Grayson rated Plaintiff B/R (below performance standards/responding to training) on 9 of the 11 performance areas and B/F (below performance standards/failure to respond to training) on the remaining 2 performance areas. SOF ¶ 87. Plaintiff read, understood, and initialed the evaluation and did not indicate that he wished to discuss it with the training supervisor. SOF ¶ 88. Plaintiff received remedial training in Phase IA but still scored a B/F on orientation and geography. SOF ¶ 89. On May 1, 2017, Plaintiff met with Venzon and Grayson to discuss his difficulties in Phase IA with four performance areas: electronic communication, geography, written communication, and field performance. SOF ¶ 91. Thereafter, a remedial training plan was implemented to assist Plaintiff in reaching satisfactory levels in these areas. *Id*.

Plaintiff's Phase IB training spanned from May 21 to June 17, 2017 with FTO Will England. SOF ¶ 92. On May 22, 2017, Venzon gave Plaintiff a memorandum outlining a training program to assist him in reaching satisfactory levels in four areas of performance. SOF ¶ 93. Venzon also extended Phase I for Plaintiff by two weeks for this remedial training. *Id*. At his end of Phase IB evaluation, England rated Plaintiff B/R in eight areas, B/F in one area (geography) and S in two areas. SOF ¶ 94. Plaintiff read, understood, and initialed the evaluation and did not indicate that he wished to discuss it with the training sergeant. SOF ¶ 95. Plaintiff's Phase IIA training spanned from June 18, 2017 to July 15, 2017, with FTO Elifritz. SOF ¶ 96. On June 20, 2017, Plaintiff met with Venzon and Elifritz to discuss his training. SOF ¶ 97. Another remedial training plan was implemented to help Plaintiff improve his performance. *Id*. At the end of Phase IIA, Elifritz rated Plaintiff an S in five areas, B/R in four areas, and B/F in two areas (electronic

communication and geography). SOF ¶ 98. Plaintiff read, understood, and initialed the evaluation but did not indicate that he wished to discuss it with the training sergeant. SOF ¶ 99.

Plaintiff's Phase IIB training was from July 16, 2017 to August 10, 2017, with FTO Justin Mitchell. SOF ¶ 101. On July 17, 2017, Plaintiff received another remedial training program from Venzon to improve his performance. SOF ¶ 100. FTO Mitchell rated Plaintiff B/R in seven areas and B/F in two areas (geography and self-initiated field activities). SOF ¶ 101. Plaintiff read, understood, and initialed the evaluation and did not indicate that he wished to discuss it with the training sergeant. SOF ¶ 102. Plaintiff's Phase IIB training was extended from August 13, 2017 to September 2, 2017 with FTO Elizabeth Blair, who rated him an S in all areas but field performance, where she rated him B/R. SOF ¶ 104. On August 15, 2017, another remedial training program was implemented for performance areas of electronic communication, geography, written communication, and field performance. SOF ¶ 103. At the time of his extended training in Phase IIC, Blair felt that Plaintiff was struggling with the program. SOF ¶ 105. During the extended training, Plaintiff and Blair were assigned to the same district Plaintiff had worked in for his Phase IIB training with FTO Mitchell so that Plaintiff would be familiar with the geography and be able to focus on other areas needing improvement. SOF ¶ 106.

Plaintiff's Phase IIIA training spanned from September 13, 2017 to October 7, 2017 with FTO J. Smiles. SOF ¶ 107. Smiles rated Plaintiff an S in eight areas, B/R in two areas, and B/F in geography. *Id*. Although Plaintiff disagreed with Smiles' evaluation, he admitted he was still performing below standards in geography. SOF ¶ 108. On September 22, 2017, another remedial training program was implemented for Plaintiff to improve his performance in written communications and field performance. SOF ¶ 110. Plaintiff's Phase IIIB training occurred between October 8, 2017 to November 14, 2017 with FTO N. Cox. SOF ¶ 111. FTO Cox rated

Plaintiff an S in seven areas, B/R in two areas, and B/F in two areas (geography and field performance). *Id*. Plaintiff read, understood, and initialed his evaluation, and for the first time indicated that he wished to discuss the evaluation with his supervisor. SOF ¶ 112. Plaintiff agreed that Cox's evaluation was his opinion but disagreed with the rating. SOF ¶ 113. On October 20, 2017, Plaintiff met with Venzon and Cox. SOF ¶ 114. At the meeting, Plaintiff admitted he was still performing below standards in areas of electronic communication, geography, written communication, and field performance. *Id*. Because of the meeting, another remedial training program was implemented to assist in these areas. SOF ¶ 115.

Following Phase III, Venzon did not recommend that Plaintiff proceed from Phase III to the shadow phase because Plaintiff was not passing the program and all remedial training had been exhausted. SOF ¶ 116. In spite of his recommendation, Scally authorized Plaintiff to proceed. *Id*. Plaintiff moved into his shadow phase on November 5, 2017 with FTO Justin Mitchell. SOF ¶ 117. Mitchell completed a weekly evaluation on November 13, 2017 for Plaintiff's first week and rated him an S in six areas, BR in three areas, and BF in two areas (geography and field performance) SOF ¶ 117. Plaintiff agreed with the evaluation that he was not meeting standards in the area of self-initiated field activities but disagreed with the remainder of the evaluation. SOF ¶ 118. On November 14, 2017, Plaintiff met with Venzon and Mitchell to discuss his performance. SOF ¶ 119. Plaintiff admitted that he missed radio traffic, used poor routes to get to call locations, passed target addresses, failed to secure a suspect in a timely manner, and did not interview a victim before closing a domestic violence call. SOF ¶ 120.

Plaintiff met again with Venzon and Mitchell again on November 20, 2017 about his performance during shadow phase. SOF ¶ 121. Prior to the meeting, Plaintiff had spoken to Venzon alone and disclosed that he had ADHD. *Id*. He also told Venzon that he was having

trouble multi-tasking when he was on medication, so he got off his medication and thought being off the medication helped him perform. *Id*. He also asked that his condition not be disclosed to anyone else. *Id*. Then, when speaking with Venzon and Mitchell during the meeting, Plaintiff acknowledged that the FTO's evaluations from the prior week were accurate, which included BF ratings. SOF ¶ 122. Plaintiff also admitted that he was slow to put out information on the radio; he failed to check a suspect for warrants even when prompted; he relied heavily on the computer system to find locations; he made some officer safety errors putting himself and others at risk several times; he was not engaging in self-initiated field activities, such as conducting traffic stops and making citizen contacts, and Mitchell often had to correct his reports. *Id*.

On November 27, 2017, Plaintiff met with Venzon and Mitchell again to discuss his performance in shadow phase. SOF ¶ 123. Before the meeting, Venzon spoke with Plaintiff about his ADHD and asked him if he needed any accommodation. *Id*. Plaintiff only told Venzon that he needed more time to learn; however, Venzon had already given Plaintiff additional time to complete the program. SOF ¶ 124. During the meeting Plaintiff also admitted, he relied heavily on the in-car geography system, still received 7 daily B/F ratings for his written reports, put the public at risk during a traffic stop by making the northbound traffic cross into southbound lanes, failed to get the names and ages of young children improperly restrained during a traffic stop, and failed to pat down a bicyclist. SOF ¶ 125.

During the last days of shadow, Venzon rode with Plaintiff to observe him. SOF ¶ 126. Plaintiff performed relatively well on two nights of the ride-along, but he still made some errors, was extremely reliant on the vehicle locator set to Google Maps, and had many more days that were below standard. SOF ¶ 127. On November 30, 2017, Mitchell completed Plaintiff's end of phase evaluation for shadow phase rating him B/F in one area (field performance), B/R in four

14

areas and S in the remaining. SOF ¶ 128. In the narrative portion, Mitchell noted that Plaintiff's lack of confidence and/or hesitation at scenes put himself and other officers' safety at risk. *Id*. Overall, Plaintiff had been given six extra weeks of training, which was more than the typical recruit, but he still performed inconsistently and unsatisfactorily. SOF ¶ 129.

### Termination Decision and Meeting

When termination for a recruit is considered, Venzon prepares a training log and outline detailing the performance deficiencies as well as the extra and remedial training provided to the recruit. SOF ¶ 130. Venzon then makes a recommendation on whether to terminate the recruit and sends the files to the officer who is higher in command than Venzon. SOF ¶¶ 130-31. Here, Venzon prepared a training log and outline recommending termination of Plaintiff because he did not meet the performance standards of the FTP despite extra time in training and remedial training plans. SOF ¶ 132. Venzon had previously spoken to Captain Scally about Plaintiff's performance and training. SOF ¶ 133. Venzon provided Scally with the prepared files, and informed Scally that, while Plaintiff performed decently with Venzon and FTO Blair, Plaintiff had at least 15 nights of poor performance during his shadow phase, struggled throughout the program, remained inconsistent, was provided six extra weeks training, and all training tools were exhausted. SOF ¶ 133-34.

Scally reviewed the training files, outline, and training log then recommend to Chief Mitchell that Plaintiff be separated based on his review and that Plaintiff failed to meet the requirements of the job. SOF ¶ 135. Chief Mitchell also reviewed Plaintiff's file and concluded "we had exhausted everything that was reasonable … that we could possibly do to help this young man[,]" yet Plaintiff was still not meeting the minimal performance standards. SOF ¶ 136. After reviewing Plaintiff's file and speaking to Scally, Chief Mitchell made the decision to

terminate Plaintiff based on his failure to meet performance standards. SOF ¶¶ 137-38. Plaintiff's ADHD did not impact Chief Mitchell's decision to separate Plaintiff's Employment. SOF ¶ 139. At that point, Venzon would be informed of the Chief's decision to terminate and be provided a meeting location and time to relay to the recruit. SOF ¶ 144.

Chief Mitchell delegated the task of carrying out the separation meeting to Scally and Assistant Chief Marion because he was unable to attend. SOF ¶ 140. Marion did not have any input or any role at all in the decision to separate Plaintiff's employment. SOF ¶ 141. A recruit is notified in advance that a meeting will occur regarding employment status and on December 4, 2020, Venzon advised Plaintiff of a meeting. SOF ¶¶ 143, 145. On his way to the meeting, Plaintiff ran into a union representative who informed Plaintiff that he did not have a right to union representation as a probationary employee. SOF ¶ 146. At the termination meeting, Plaintiff met with Scally, Marion, and Venzon. SOF ¶ 147. During the meeting, Plaintiff was given the opportunity to be heard regarding the decision to separate from employment. SOF ¶ 150. Plaintiff disputed the termination decision, asked if there was more training or if his training could be extended, and said he would be a good officer for Peoria. SOF ¶ 151. He did not raise his ADHD or request any accommodations for his ADHD at the December 4, 2017 meeting. SOF ¶ 153. Plaintiff was told that the Department was prepared to fire him that day if he did not resign so Plaintiff decided to submit a resignation letter. SOF ¶¶ 148-49. If Plaintiff had brought up something at the meeting that Marion believed was important or crucial, Marion would have taken it back to Chief Mitchell to reconsider. SOF ¶¶ 154-55. Venzon was unaware of any recruit around 2017 with similar below-standard performance issues as Plaintiff who was still retained and allowed to go into the solo phase and become a permanent officer. SOF ¶ 156. Plaintiff did

not ask the union representative for further assistance because he was embarrassed that he got fired and he was told that the union did not represent probationary officers. SOF ¶ 152.

***Hostile Work Environment Allegations***

The City of Peoria has an Employee Handbook which addresses discrimination and harassment. SOF ¶ 8. The Handbook encourages employees who feel they have been the victim of any harassment to promptly report the discrimination to the department head, HR Manager, EEO Manager, or city attorney. SOF ¶ 9. Upon being hired, Plaintiff received and understood the anti-harassment policy and training which referenced the procedures for submitting complaints about harassment. SOF ¶ 168. Plaintiff was called "Dumberger" but none of the Defendants called him that name. SOF ¶ 157. Some FTOs told him that he had to eat separately in the car while the FTOs met together and ate. SOF ¶ 159. At monthly FTO meetings, FTO Blair overheard some FTOs speaking negatively about Plaintiff. SOF ¶ 160. Plaintiff thought he was targeted because he was accused of cheating on an exam. SOF ¶ 161. Venzon asked Plaintiff multiple times in meetings if he "was stupid, lazy or just do[es]n't care." SOF ¶ 162. Plaintiff also described one incident where he left his vehicle unsecured and another officer decided to "teach [him] lesson to leave a vehicle unsecured" by taking the rifle, duty bag, and ammo out of the vehicle. SOF ¶ 163. Venzon was unaware of any recruits being ridiculed or made fun of by FTOs. SOF ¶ 165. Plaintiff never told Marion, Mitchell, or Scally about any harassment, name-calling or discrimination. SOF ¶ 167. At no point during his employment did Plaintiff document or report any incident of discrimination, harassment, hostile work environment, or failure to provide an accommodation due to his disability. SOF ¶ 169. He also did not report any harassment to HR, city administrators, city officials or the legal department. SOF ¶ 170.

## 2. Plaintiff's Additional Material Facts

As noted in Defendants' Reply and identified by the Court, the following "undisputed facts" listed in Plaintiff's Response were revised but duplicative versions of Defendants' proposed undisputed facts: Plaintiff's SOF ¶¶ 1, 3-23, 26-36, 41-43, 46-50, 55-69. For most of them, Plaintiff also did not cite evidence in the record to support them but rather a page of Defendants' summary judgment brief. *See* Fed. R. Civ. P. 56(c)(1)(A). Therefore, the Court disregards those statements.

The following facts are additional to the undisputed facts provided by Defendants that were cited with evidentiary support. Unless otherwise noted, Defendants do not dispute them. Since leaving the Department, Plaintiff has held multiple law enforcement and security officer jobs including working for the Mansfield Police Department, Illinois Central College, San Jose Police Department, and Manito Police Department. Pltfs. SOF ¶ 2. Plaintiff thought his ADHD was documented when he met with Venzon but had no idea what Venzon documented himself. Pltfs. SOF ¶ 38. Plaintiff believed he told Venzon that he was not getting any accommodations or extra training or any feedback in a proper amount of time to understand the training but did not put this request in writing because he thought Venzon was documenting it. Pltfs. SOF ¶¶ 39-40.[3] 44-45. Plaintiff does not recall admitting to Special Agent Matos that he cheated on the exam and believed that if Matos wrote that down, it was simply his interpretation of what was said. Pltfs. SOF ¶ 52. Plaintiff also told Matos that if they were accusing him of cheating that he was not going to sit there, argue, and debate this with him. Pltfs. SOF ¶ 51. In 2019, as part of his application to the state police, Plaintiff was interviewed by Special Agent Lisa Osborn in which

---

[3] Defendants marks this statement undisputed but immaterial because Plaintiff admitted he did not ask for any accommodation for his ADHD before November 20, 2017. Doc. 56, at 8. The Court agrees. Plaintiff does not use these statements to support his argument in his brief and it is undisputed that Plaintiff did receive additional training and feedback from FTOs during his training.

he signed an Affidavit of Truthfulness and stated that he did not cheat on the exam. Pltfs. SOF ¶ 53. In his deposition, Plaintiff maintained that he did not cheat on the exam. Pltfs. SOF ¶ 54. He also testified that he believed the 100-block test was only changed for Plaintiff and no other recruit. Pltfs. SOF ¶ 44 (citing Umberger Dep., p. 160-161). Defendants dispute Plaintiff's SOF ¶ 44 and asserts it is unsupported by the evidence cited. Doc. 56, at 9. Rather, Plaintiff testified the test was changed after he failed the first one and he believed it was different for him because no one else had to take the test multiple times, having passed it the first time *Id.* (citing Ex. A, Umberger Dep., p. 159-161). Defendants also assert "[a]s can be seen by the tests themselves (Defs.' Ex. A, Umberger Dep. Ex. 8), the subsequent tests covered the same material but in a different fashion to prevent test-takers from simply memorizing the answers." *Id*. The Court agrees that Defendants' articulation of Plaintiff's cited deposition is more accurate than Plaintiff's SOF ¶ 44. Plaintiff also testified the 100-block test continued to be changed after Plaintiff had successfully passed it. Pltfs. SOF ¶ 45. The Court will address Defendants' latter assertion in the discussion section of this Opinion. The remaining facts in Plaintiff's statement of facts are immaterial and unnecessary to recite here.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770

(7th Cir. 2003). In resolving the motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the evidence, however, is "merely colorable, or is not significantly probative" or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions, or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment." *Waldridge*, 24 F.3d at 920.

## DISCUSSION

Defendants have moved for summary judgment on all remaining claims. Doc. 50. Although Plaintiff has not moved for summary judgment, he agrees there are no disputed facts. Doc. 53. Rather, Plaintiff argues (1) the undisputed facts demonstrate there was disability discrimination under the ADA; (2) the undisputed facts demonstrate that he has stated a claim for disability discrimination under § 1983; (3) he did not receive all procedural protections that were due under the U.S. Constitution; (4) the individual Defendants are not entitled to qualified immunity; and (5) The City of Peoria must indemnify the individual Defendants for the

violations Plaintiff alleges. *Id*. The Court will address each issue in the same order as the

Plaintiff, beginning with the disability discrimination claim premised on the Americans with

Disabilities Act and Section 504 of The Rehabilitation Act. Like the Parties, the bulk of the

Court's analysis is devoted to this claim.

## I.  Violations of the ADA and Rehabilitation Act

As Plaintiff articulates, a plaintiff may state a claim for discrimination under the ADA by

advancing either (1) a "failure to accommodate" theory—that the employer failed to provide a

reasonable accommodation for the employee's disability—or (2) a "disparate treatment"

theory—that the employer treated the employee differently *because of* his disability. *Sieberns v.*

*Wal–Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). Plaintiff makes clear in his Response

that he is not making a failure to accommodate claim: his argument "is not that there should have

been an accommodation for the [100-block divider] test, since a formal request was not made at

the time," but rather that Defendants had knowledge of Plaintiff's ADHD, so it "purposely

administered tests in this way to invoke failure." Doc. 53, at 15. Plaintiff is the master of his own

complaint. *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 986 (7th Cir. 2000). Therefore,

the Court need not address whether Defendants should have accommodated Plaintiff and if so,

whether they failed to reasonably do so regarding the 100-block test or any other aspect of

Plaintiff's training.

To the extent one could infer Plaintiff sought to proceed on such theory based on remarks

elsewhere in his brief,[4] he fails to explain what reasonable accommodation he should have been

---

[4] *See* Doc. 53, at 13. In discussing the second prong of the *McDonnell-Douglas* framework, Plaintiff states:
Defendants contend that Plaintiff was not able to perform the essential functions of the job regardless
of with an accommodation or not. Plaintiff successfully held law enforcement jobs before and after
this occurrence demonstrating that is capable or at the very minimum, possesses the capability to at
some point, [to] perform those essential functions. (Pltfs. SOF, ¶ 2). When a disabled employee
cannot perform the essential functions of a job, the court in ADA suit must consider whether any
reasonable accommodation by the employer would help the employee to perform those functions.

given beyond the additional time he had to complete the training phases that no other recruit received. *See* SOF ¶ 134. To establish a claim for failure to accommodate, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). It is proper to grant summary judgment where a plaintiff has failed to meet prong three. *Id*. Here, Plaintiff did not attempt to make such argument to demonstrate a dispute of fact exists as to whether his employer failed to reasonably accommodate his disability.

Turning his disparate treatment claim, a disparate treatment claim based on disability under the ADA or Rehabilitation Act requires Plaintiff to show (1) he was disabled; (2) he was qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the "but for" cause of the adverse employment action. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (citing *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503–04 (7th Cir. 2017); *Felix v. Wis. Dep't of Transp.*, 828 F.3d 560, 568 (7th Cir. 2016)). To demonstrate causation, a plaintiff may use the *McDonnell Douglas* burden-shifting framework. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020). Plaintiff elects to do so here. *See* Doc. 53,

---

Americans with Disabilities Act of 1990, §102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A). *Amadio v. Ford Motor Co.*, 238 F.3d 919 (7th Cir. 2001).

However, thereafter he does not discuss reasonable accommodation at all or whether he needed it. Rather, Plaintiff returns to his discussion of disparate treatment. Thus, any claim of failure to accommodate is also underdeveloped and waived. *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 511 (7th Cir. 2020), *reh'g denied* (Jan. 7, 2021) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]"). *See also Hooper v. Proctor Health Care Inc*., 804 F.3d 846, 852 (7th Cir. 2015) (noting, in the context of a complaint, "the mere invocation of ADA discrimination and the inclusion of the word 'accommodation' in the cited definition of qualified individual does not provide adequate notice that a plaintiff is alleging a failure to accommodate claim").

22

at 12-13 (citing *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021)).

In their Motion, Defendants offer four arguments as to why they are entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claim. Doc. 50, at 28-45. First, Plaintiff has not established a prima facie case of discrimination in applying the first four prongs of the *McDonnell Douglas* burden-shifting framework. *Id.* at 30-37. Second, even if Plaintiff has met his burden, Defendants claim they have presented legitimate, non-discriminatory reasons for his termination, which Plaintiff has failed to rebut with evidence of pretext. *Id.* at 38-40. Third, the undisputed facts do not establish a hostile work environment claim as part of his ADA claim. *Id.* at 40-43. Finally, Plaintiff did not request an accommodation until the end of his employment and received reasonable accommodations that he now claims to have requested. *Id.* at 44-45.

Plaintiff responds to Defendants' Motion by loosely following the *McDonnell Douglas* framework. Doc. 53, at 12-14. The Court also notes Plaintiff does not address the Defendants' second, third, or fourth arguments. Therefore, Plaintiff concedes he has not established a hostile work environment claim as part of his discrimination claim; if he has not met the four prongs of *McDonnell Douglas*, then he has no evidence to offer for the burden-shifting portion of the framework in steps five and six; and he cannot successfully establish a failure-to-accommodate claim. *See C & N Corp. v. Kane*, 756 F.3d 1024, 1026 (7th Cir. 2014) (holding a nonmovant's failure to make an argument in response to a summary judgment motion amounted to waiver of that argument); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (noting the silence resulting from the non-movant's failure to file a response brief was deafening and resulted in waiver). Notably, Plaintiff also did not seek leave to file a sur-reply to respond to Defendants' waiver arguments.

In considering the evidence as a whole, the singular question that matters in a discrimination case is: "Whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (holding the plaintiff's discrimination claim failed under the *Ortiz* holistic approach and *McDonnell Douglas* framework). It is well-settled that a plaintiff may still utilize the *McDonnell Douglas* "burden-shifting" framework to meet the holistic standard described in *Ortiz*. *Id.*; *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Regardless of the approach applied in proving a discrimination case, at summary judgment Plaintiff has the burden to demonstrate genuine issues exist for trial. *Markel v. Bd. of Regents of Univ. of Wisconsin Sys.*, 276 F.3d 906, 910 (7th Cir. 2002). The Parties have chosen to present their positions using the *McDonnell Douglas* framework. The Court will do the same.

### A. *McDonnell Douglas* Framework

The *McDonnell Douglas* framework for employment discrimination claims requires Plaintiff to show: (1) he is a member of a protected class; (2) he was meeting the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Marnocha*, 986 F.3d at 718. A court need not address the other elements of the framework, including legitimate business expectations, where the plaintiff failed to satisfy the fourth element by not providing sufficient evidence regarding a similarly situated individual. *McDaniel*, 940 F.3d at 368. If a plaintiff establishes a prima facie case under *McDonnell Douglas*, then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the

adverse employment action." *Carson v. Lake County, Indiana*, 865 F.3d 526, 533 (7th Cir. 2017). If such reason is given, then the burden shifts back to the plaintiff to demonstrate that the employer's explanation is "pretextual." *Id.* However, as indicated above, Plaintiff failed to respond to Defendants' argument regarding steps five and six and therefore conceded he has no evidence to offer to support pretext or rebut Defendants' assertions on these issues. To the extent some arguments for pretext could overlap with arguments raised where Plaintiff addresses his employer's legitimate expectations in prong two, the Court has addressed them below. Regardless, Plaintiff has failed to meet his burden to establish each element of his prima facie case under the *McDonnell Douglas* framework.

For the purposes of summary judgment, Defendants concede that Plaintiff was disabled as defined by the ADA and Rehabilitation Act and was subjected to an adverse employment action by virtue of his termination or forced resignation. Doc. 50, at 29. However, Defendants argue Plaintiff cannot show that he was qualified for the job of patrol officer or that he met the legitimate job expectations and that similarly situated individuals were treated more favorably. *Id.* at 30-37. In his Response, Plaintiff claims he met "prong two" because he successfully held law enforcement jobs before and after he worked at the Department, which demonstrate that he was "capable or at the very minimum, possesse[d] the capability to at some point, perform those essential functions." Doc. 53, at 13 (citing Pltfs. SOF ¶ 2). He then recites the partial definition of "qualified individual" but does not argue whether he needed a "reasonable accommodation" to be considered as "qualified." *Id*. Thereafter, Plaintiff pivots to claim that he was consistently improving with his training but struggled due to the "disparate treatment" he faced, as shown by his circumstantial evidence. *Id*. The Parties blend their discussions of a "qualified individual" and "meeting an employer's expectations." The Court agrees there is some overlap but the

definition of a "qualified individual" also addresses whether the individual can perform the job "with or without accommodations." Therefore, the Court does separate the discussions to review the accommodation aspect of a "qualified individual."

A "qualified individual" is an individual who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). On the issue of whether Plaintiff was "qualified," he did not propose any accommodation that would have enabled him to perform this job. Even so, his history with the position shows that, even with the accommodation of additional time, he could not perform the job. Plaintiff agrees that understanding Department policies and how certain people want the officer to perform were essential functions of the job. *See* SOF ¶¶ 63, 66. Becoming proficient in all 11 areas was also essential to successfully complete the FTP and become an officer. SOF ¶¶ 17, 38. At the same, Plaintiff admits his ADHD substantially impacts his ability to focus, learn, and comprehend what he reads. SOF ¶ 61. It has also substantially limited his ability to work as a police officer by impacting his ability to understand geography, department policies, logs, work performance, and how certain people want things done. SOF ¶ 62.

It is undisputed that the only things Plaintiff eventually expressed needing (in November 2017) because of his ADHD were additional time and learning in different ways. SOF ¶ 71. Yet, all of the written tests that recruits took were untimed, he had additional training time, and recruits were given a variety of ways to learn geography including learning on the street with FTOs and being given maps and a list of the hundred blocks. SOF ¶¶ 24, 55, 58. Plaintiff does not challenge the adequacy of training on this subject from FTOs or the written material he received. Nor does he explain what he should have been allowed to learn instead. Moreover, he

26

ultimately passed the geography exam. However, geography was only one piece of the 11-category competency puzzle and the test was one aspect of the evaluation for competency in this category. After the end of his extended training spanning an additional six weeks to that of a typical recruit, the FTO in the shadow phase still concluded that Plaintiff did not meet the performance standards in five areas. SOF ¶ 128. Thus, Plaintiff has not shown he could perform the job with or without accommodations, which is a prerequisite to his disparate treatment claim.

As persuasively argued by Defendants, Plaintiff admittedly could not meet his employer's expectations. To the extent Plaintiff relies on his jobs before and after he worked at the Department to meet this prong, the expectations of another law enforcement office wholly fail to address the "Defendant's expectations" here. The second prong does not ask for the expectations of police departments or the broad umbrella of "law enforcement" generally, it asks for those of the named Defendant, the City of Peoria. Moreover, the Court "must examine [his] performance at the time of the challenged adverse actions," not at some later date with a different employer. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007). Therefore, Plaintiff's reference to his employment prior to his position as a Peoria Police Department recruit and his post-employment positions are not relevant.

Turning to the undisputed facts, Plaintiff was aware during training that he was performing below standards throughout phases I, II, and III of training as well as the shadow phase. SOF ¶¶ 90, 98, 101, 115, 122, 125. It is undisputed that Plaintiff knew he had to successfully complete the FTP as well as the year and a day probationary period. SOF ¶¶ 14, 17. Plaintiff failed to do so because of his inability to meet the standards in all 11 categories, therefore he could not have met his employer's legitimate expectations.

Regarding the FTP, Plaintiff agrees there were 11 areas of competency he had to receive satisfactory scores in and every recruit who had successfully completed the program and was hired had satisfactory performance standards in all of these areas by the end of the shadow phase. SOF ¶ 51. His evaluations were rated consistently below standards with few exceptions. SOF ¶¶ 87-90, 94-95, 98-99, 101-102, 104, 107-108, 111-112, 114, 117-120, 122-123, 125, 128. Plaintiff does not contest the legitimacy or reasonableness of any of these 11 categories of expectations. He did not dispute the evaluations he received throughout the process as he read, understood, initialed, and signed each evaluation. SOF ¶¶ 88, 95, 99, 102, 112. Aside from one evaluation, he never wished to discuss his FTO's evaluations with the training sergeant. SOF ¶ 112. Thereafter, Venzon even shadowed him and observed deficiencies like the FTOs had been documenting throughout his field training process.

Plaintiff also received additional time to complete his training beyond that of a typical recruit, but he still failed to consistently meet performance standards, which resulted in Venzon's recommendation to terminate his probationary period. SOF ¶¶ 129, 132, 134. Even after remedial training, he continued to score below the standards in electronic communications, geography, written communication, and field performance. During the shadow phase, Plaintiff also admitted other specific issues he had: that he missed radio traffic, used poor routes to get to call locations, drove past target addresses, failed to secure a suspect in a timely manner, and did not interview a victim before closing a domestic violence call. SOF ¶ 120. He was slow to put out information on the radio, failed to check a suspect for warrants even when prompted, relied heavily on the computer system to find locations, made some officer safety errors putting himself and others at risk several times, and his FTO often corrected his reports. SOF ¶ 122. These concessions are fatal to Plaintiff's claims as he has essentially conceded he did not meet the Department's

expectations. *See Buntin v. City of Indianapolis*, 500 Fed. Appx. 524, 526 (7th Cir. 2013);

*Squibb*, 497 F.3d at 788. Based on the Court's discussion above, it is clear Plaintiff has not

shown he met his employer's legitimate expectations or that those expectations were illegitimate.

This same evidence regarding the employer's expectations could be used to rebut any

perceived argument by Plaintiff as to pretext for his termination and Defendants do argue it as

such. *See* Doc. 50, at 38-40. Defendants argue Plaintiff was terminated because of his poor and

inconsistent performance throughout his training, including the shadow phase, and Chief

Mitchell's belief that he would not be an effective police officer. *Id.* at 39-40. "The only concern

in reviewing an employer's reasons for termination is the honesty of the employer's beliefs."

*Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) (citing *Balderston v.

Fairbanks Morse Engine Division*, 328 F.3d 309, 323 (7th Cir. 2003)). To show pretext, a

plaintiff must present evidence suggesting the employer's "proffered reason is a lie" by

identifying "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's

asserted "reasons that a reasonable person could find it unworthy of credence." *Marnocha*, 986

F.3d at 721 (quoting *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018); *Boumehdi v.

Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (internal quotation marks omitted)).

In his brief, Plaintiff does not challenge the honesty of Chief Mitchell's belief that he did

not meet the Department's standards or his ultimate decision that Plaintiff should be terminated.

*See* SOF ¶¶ 137-138. Plaintiff also did not dispute Chief Mitchell's affirmation in his deposition

that ADHD did not impact his decision to terminate Plaintiff. SOF ¶ 139. In his Response,

Plaintiff does not challenge the honesty of the evaluations he received throughout his FTP,

agreeing they were the FTOs opinion; rather, he simply disagrees with them. An inquiry into

pretext evaluates "the honesty of the employer's explanation, rather than its validity or

29

reasonableness[.]" *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). Moreover, mere

subjective disagreement with evaluations of one's own performance does not create a genuine

issue of material fact as to an employer's honest assessment of whether the employee met

legitimate job expectations. *Fortier v. Ameritech Mobile Comm., Inc.*, 161 F.3d 1106, 1114 (7th

Cir. 1998). It is undisputed that at the time of his termination, Venzon, Scally, and Chief Mitchell

did not believe Plaintiff was meeting the Department's standards and they had exhausted all

reasonable training to help him succeed. *See generally* SOF ¶¶ 130-139. Additionally, Plaintiff

did not dispute the process that took place regarding the decision to terminate him. In sum,

Plaintiff has failed to rebut the voluminous evidence showing his deficiencies throughout the

FTP and he has not provided evidence that the Department's reason for termination was

pretextual. *See generally* SOF ¶¶ 86-120.

 Although Plaintiff claims to follow the *McDonnell Douglas* framework, he fails to

address the fourth prong requiring him to identify someone who was similarly situated to him but

treated more favorably. This failure alone is fatal. *See McDaniel*, 940 F.3d at 369 (holding a

plaintiff's prima facie case failed where she failed to identify any similarly situated employees to

allow a factfinder to conduct a "meaningful comparison") (citing *Barricks v. Eli Lilly and Co.*,

481 F.3d 556, 560 (7th Cir. 2007)); *see also Skiba*, 884 F.3d at 723. Based on the above, no

reasonable factfinder could conclude that Plaintiff's ADHD caused him to be terminated.

### B.  Plaintiff's Additional Circumstantial Evidence

 In the interest of following *Ortiz*, in addition to the evidence discussed above, the Court

considers the circumstantial evidence Plaintiff offers in further support of his disparate treatment

theory. His circumstantial evidence of discrimination appears to be the vernacular of the U.S.

code governing discrimination, the fact that he was tested multiple times, with different

variations even though Defendants knew he suffered from ADHD, and the fact that unnamed FTOs made fun of his intelligence.

On the issue of testing, Plaintiff argues he received disparate treatment because he was given the same test which tested the material in a different order. He claims this was an intentional act of discrimination. However, his argument is difficult to follow and ultimately conclusory as he fails to explain in fact or in caselaw, how this administration of the test was "purposefully detrimental." Doc. 53, at 15. He does not pinpoint when he took the tests and what Defendants' knowledge was regarding his ADHD at the time. Was it just his remark to HR that he took Adderall for the purposes of a drug test? Was it after his vague remarks to Venzon that he may need more training and learned differently than others? Or was it after his November 2017 meeting when he finally asked for an ADHD accommodation of more time? Plaintiff does not allege others who re-took the geography test were presented with the questions in the same order whereas he was not. Rather, the evidence he cites in his testimony is that he had to take the test in a different order because, unlike all of the others, he failed to pass the original test. Doc. 50-1, at 159-161. Defendants' proffered reason for the change is that the material is the same but it is presented in a different fashion to prevent test-takers from simply memorizing the answers and it ensured that Plaintiff was tested on his understanding of the underlying subject matter. Doc. 56, at 9, 14. Notably, Plaintiff never informed anyone that this presentation caused him an issue because of his ADHD or that he needed an accommodation. The test was also untimed. Plaintiff has not challenged the honesty of the employer's explanation for changing the testing format. *See Hill*, 724 F.3d at 968.

Connecting Plaintiff's argument with the U.S. Code that he cites, he does not explain how testing the material in a different order was not job-related or was inconsistent with business

necessity. Doc. 53, at 14 (citing 42 U.S.C. § 12112). Plaintiff took the test 22 times. It is reasonable that an employer might be concerned that a test-taker would simply memorize the test rather than understand the material by repeatedly re-taking the test in the same order. Recall geography is a critical skill, along with an understanding of Peoria's 100-block divider system, so that a police officer can get to where the officer is needed and arrive at a call. SOF ¶¶ 55, 64. Plaintiff also does not explain which part of 42 U.S.C. § 12112(b)(7) he intends to use to support his disparate treatment argument and how the test was not administered in the most effective manner or what that appropriate manner would have been throughout his 18 attempts to pass.

Plaintiff further states that on top of the academic scrutiny, Plaintiff faced verbal harassment from others in regard to his intelligence, which directly correlated to his ADHD and FTO Mitchell specifically heard other FTOs speaking negatively about Plaintiff's efforts to progress when it came to geography. Doc. 53, at 15 (citing Pltfs. SOF ¶¶ 57-62). However, Plaintiff elsewhere waived his argument in support of a hostile work environment claim. Where relevant to his discrimination claim, it is unclear how all of these comments in Plaintiff's SOF ¶¶ 57-62 "directly correlate[] to his ADHD" and whether they were made by named Defendants in this case. For example, it is not apparent how being accused of cheating or being told he, as a recruit, had to eat in a separate car so that the FTOs could meet together, are discriminatory comments about ADHD. Plaintiff makes no argument to explain such correlations beyond his conclusory remark. Additionally, many of the statements Plaintiff cites for support are vague in content and identifying who made the comments about Plaintiff. *See e.g.*, Pltfs. ¶¶ 57-59, 62.

At best, Plaintiff cites to statements that Venzon made multiple times to him during meetings wherein he asked Plaintiff if he "was stupid, lazy or just doesn't care." Pltfs. ¶ 61. Even if such comments were "arguably discriminatory," courts are often cautious about relying on

"stray remarks" as evidence of discriminatory animus *Bunn*, 753 F.3d at 684–85 (citing *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013); *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006)). "[I]solated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process.'" *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)). *See e.g., Hooper*, 804 F.3d at 854–55 (holding the defendant's comment four months before termination that she had a contentious relationship with her mother-in-law, who was bipolar like plaintiff, was insufficient to support a discrimination claim); *Markel*, 276 F.3d at 910 (holding comments made two months before a termination decision were not contemporaneous to adverse action). Here, Plaintiff does not identify when these comments were made, and he has not made a causal connection between them and his termination. Even when considering the evidence Plaintiff discussed regarding the *McDonnel Douglas* framework and his circumstantial evidence described here, the Court still finds that no reasonable juror could find in Plaintiff's favor that he was discriminated against because of his ADHD disability. Therefore, summary judgment is granted on Plaintiff's claim under the ADA and Rehabilitation Act in Count IX.

## II.    Section 1983 Disability Discrimination

Regarding Plaintiff's equal protection claim, Defendants contend the undisputed facts demonstrate Plaintiff has not stated a claim for disability discrimination under § 1983. Doc. 50, at 45-47. In his Response, Plaintiff argues the disparate treatment he received was not connected to a legitimate state interest. Doc. 53, at 16. As cited by Plaintiff, while disabled individuals receive broader protection under the ADA, the relevant standard of review for an equal protection claim is rational basis review. *Id.* at 15-16 (citing U.S. Const. Amend. 14; Americans

with Disabilities Act of 1990 §§ 202, 302(a), 42 U.S.C. §§ 12132, 12182(a). *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 263 F. Supp. 3d 705 (N.D. Ill. 2017), *aff'd*, 881 F.3d 587 (7th Cir. 2018); *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732 (7th Cir. 2000)). Indeed, the Supreme Court has held that disability is not a "suspect classification" under the Equal Protection Clause, so a plaintiff alleging an equal protection violation on the basis of their disability has to show that the state actor's discrimination was not rationally related to a legitimate state interest. *See Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366-68 (2001). The State need not even articulate its reasoning at the moment the decision is made. *Id*. at 367. Rather, the challenging party has the burden to negate "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). A rational basis "may be based on rational speculation unsupported by evidence or empirical data." *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 947 (7th Cir. 2009) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

Here, Plaintiff argues because he was tested early-on in his training through multiple tests which exacerbated his disability, they was not connected to the legitimate state interest of protecting the public. Doc. 53, at 16. It is unclear whether Plaintiff is referring to all of the tests on different subjects that he had to take or the times he had to repeatedly take the geography test. *See* SOF ¶ 41. Assuming the method of testing was discriminatory, he has not negated every conceivable rational basis for the difference in treatment. Focusing on the timing of the tests is hardly enough to meet Plaintiff's burden to overcome rational basis review. Defendants also offered various reasons for the early or repeated testing including the City wanting its probationary officers to learn quickly, complete training without delay, or be able to multi-task and focus on several things at once during a call. Doc. 50, at 46. All of these reasons appear to be

rationally related to the "legitimate state interest of protecting the public" which Plaintiff argues

to be the interest "of the utmost importance" at issue here. Additionally, Plaintiff repeatedly

struggled with geography throughout the FTP so it is conceivable that his employer may re-test

him on that subject as he previously failed to meet expectations for that category throughout his

training and geography was a critical area that he needed to pass to serve the public as an officer.

Doc. 56, at 17 (citing SOF ¶¶ 86-129). A police officer needs to able to get where the officer is

needed and arrive at a call. SOF ¶¶ 55, 64. These, in turn, relate back to the overall interest of

protecting the public. As such, Plaintiff has not disproved all rational basis, therefore his equal

protection claim in Count I fails, and summary judgment is granted.

### III.    Section 1983 Procedural Due Process

Plaintiff's next argument in his Response is that he "did not receive all procedural

protections that were due under the U.S. Constitution." Doc. 53, at 16. In their Motion,

Defendants argue they are entitled to summary judgment because Plaintiff had no property

interest in his probationary employment and even if he did, he received all of the procedural

protections due to him. Doc. 50, at 47-51. Plaintiff's Response to withstand summary judgment

is brief. He recites the definition of "procedural due process" and its requirements, then admits

he received notice of the termination meeting and was given the opportunity to be heard. Doc.

53, at 17. However, he claims his due process rights were violated because he pays union dues,

therefore, he should have been afforded the opportunity to have the union representative sit in on

the meeting and/or advise him. Plaintiff claims this did not happen because an unnamed union

representative who Plaintiff ran into on his way to the termination meeting informed Plaintiff

that probationary employees were not entitled to union representation. *Id.* (citing Pltfs. SOF ¶¶

64, 69). There is no evidence cited from the record that indicates Plaintiff paid union dues nor is it stated in his additional statement of material facts, so the Court disregards that statement.

To state a due process claim, a plaintiff must first establish he had a constitutionally protected property interest in his employment. *Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009); *Covell v. Menkis*, 595 F.3d 673, 675 (7th Cir. 2010). "Under Illinois law, a person has a property interest in his job only where he has a legitimate expectation of continued employment based on a legitimate claim of entitlement." *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). Here, Plaintiff would need to show a legitimate expectation of continued employment by pointing to an Illinois law, an ordinance, a contract, or some understanding that limited the Department's ability to discharge him. *Redd v. Nolan*, 663 F.3d 287, 296 (7th Cir. 2011) ("It is well-settled that probationary public employees do not possess a property interested in continued employment and thus have no right to procedural due process before their employment may be terminated."). While Illinois generally does not recognize a property interest in continued employment for probationary public employees, a municipality may provide greater protection to these employees through enacting rules and regulations. *Id*. Such a rule or regulation can only create a property interest if it is a "clear policy statement" that overcomes the clear statutory language allowing probationary employees to be fired without cause. *Id.* at 296-97.

When the Parties briefed this issue at the Rule 12(b)(6) stage, Plaintiff claimed probationary officers in Peoria were given greater due process protection than provided by state law because Field Training General Order 300.11 created an entitlement to a propriety interest, which was "strengthened by other agreements, policies, and aspects of the recruit program." Doc. 28, at 8 (citing Doc. 23, at 4). The Court denied Defendants' motion to dismiss Plaintiff's due process claim because Plaintiff did assert Defendants were limited in their ability to

discharge recruits. *Id.* at 9. However, the Court emphasized that "[i]t is questionable whether FTGO 300.11 or any other provision establishes Umberger had a protected property interest in his employment because he does not allege recruits could be terminated only for cause." *Id*. Therefore, the Court allowed discovery to proceed with the belief that it would further resolve the issue. Discovery has concluded and the Court is in better position to opine.

Nothing appears to have changed since the Court's 12(b)(6) ruling except the standard at summary judgment is different where the Court does not accept Plaintiff's bare allegations as true. Rather, it "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). There is no disputed fact that needs resolved to conclude Plaintiff did not have a property interest in his employment. It is undisputed that Plaintiff was a probationary employee when he was terminated and General Order 300.11, which Plaintiff relied on in his Complaint for his procedural due process claims, does not state that a recruit or probationary officer could only be fired "for cause." SOF ¶¶ 19, 22. Recruits are at-will employees during the probationary period, and the Chief of Police does not need cause to separate a probationary officer from employment. SOF ¶ 18. Plaintiff could not point to a statute, regulation, rule, general order, or contract that stated that a probationary officer could only be fired for cause. SOF ¶ 20. In his Response, Plaintiff conceded this issue of a property interest entirely by failing to demonstrate he has a constitutionally protected property interest, which is the first requirement for a due process claim. *Rujawitz*, 561 F.3d at 688 (citing *Moss*, 473 F.3d at 700; *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996)). He also failed to respond to Defendants' argument on this requirement at all, thus waiving his argument. *See C & N Corp.*, 756 F.3d at 1026. Based on the undisputed facts, and as laid out in Defendants' Motion (Doc. 50,

at 47-51), Plaintiff has failed to provide evidence of any Illinois law, ordinance, contract, or some understanding that limited the Department's ability to discharge him or a "clear policy statement" that created a property interest in his probationary employment, therefore his due process claims fail. *See Redd*, 663 F.3d at 296-97.

To the extent there could be any remaining questions surrounding the union representative's role regarding termination meetings for recruits, Plaintiff cites no evidence to support that he was entitled to representation, that he actually requested it, or that Defendants prevented a union representative from attending the meeting. More importantly, he fails to discuss how representation somehow created a property interest. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]" *Williams*, 982 F.3d at 511. This case is at summary judgment, well after discovery has ended wherein Plaintiff had an opportunity to take discovery on this issue. At this point, his allegations regarding whether he was entitled to such representation are mere speculation. *See Overly*, 662 F.3d at 864; *Johnson*, 325 F.3d at 901. Thus, summary judgment is granted on Count II as Plaintiff failed to show he had a property interest and there are no disputed facts that require a trial. *See also* Doc. 53 (advocating throughout that there are no disputed facts).

### IV.    Section 1983 Retaliation

In Count VII, Plaintiff's Complaint also raised a Section 1983 retaliation claim. In ruling on Defendants' motion to dismiss Plaintiff's Complaint, the Court allowed him to proceed on this theory "by way of a due process violation." Doc. 28, at 18. It seems Plaintiff has abandoned his retaliation claim. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 718, 721 (7th Cir. 2011). He does not discuss how he was retaliated against in his statement of material facts section or argument section of his brief even though Defendants seek summary judgment on all claims. He also fails

to respond to Defendants' arguments in their Motion asking for summary judgment on this claim and their Reply arguing that Plaintiff waived his claim by failing to demonstrate a triable issue of fact exists that requires a trial. *See* Doc. 50, at 51-53; Doc. 56, at 18. Thus, Plaintiff has waived his arguments to defeat summary judgment. *See C & N Corp.*, 756 F.3d at 1026. Even so, Plaintiff has conceded he had no property interest, which is a prerequisite to a due process claim. *See Rujawitz*, 561 F.3d at 688. Thus, the Court concludes summary judgment is appropriate on Plaintiff's retaliation claim.

## V.     Remaining Arguments: Indemnification and Qualified Immunity

Count VI is a state law indemnification claim against the City or Peoria. Plaintiff concedes he has not made any substantive allegations against the City of Peoria, rather it is only being used for indemnification purposes. Doc. 53, at 18. "A local public entity is not liable where an employee is not liable." *Vill. of Bloomingdale v. CDG Enters., Inc.*, 752 N.E.2d 1090, 1100 (Ill. 2001) (citing 745 ILCS 10/2–109). Thus, because Plaintiff no longer has any viable claims against the individual Defendants, summary judgment is appropriate on Count VI for indemnification. Additionally, because summary judgment is appropriate on all claims, the Court need not address the Parties' arguments regarding qualified immunity.

## CONCLUSION

For the reasons set forth above, Defendants' Motion (Doc. 50) for Summary Judgment is GRANTED. The Clerk is directed to close the case.


Signed on this 21st day of January, 2022.

s/ James E. Shadid
James E. Shadid
United States District Judge